(No. 33646.—

EDWARD S. FLYNN, Appellant, *vs.* LA SALLE NATIONAL BANK, *et al.*, Appellees.

*Opinion filed May 23, 1956—Rehearing denied September 24, 1956.*

130

HARRY J. MYERSON, MAURICE H. KAMM, and FRED A. GARIEPY, all of Chicago, (JOHN SPALDING, of counsel,) for appellant.

NICHOLSON, NISEN & ELLIOTT, of Chicago. (JOHN R. NICHOLSON, CHARLES M. NISEN, and CLYDE O. BOWLES, JR., of counsel,) for appellee La Salle National Bank; MURPHY, PEARSON & O'CONNOR, of Chicago, (WALTER P. MURPHY, and WALTER WM. PEARSON, of counsel,) for other appellees.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This is a class action on behalf of the minority beneficiaries of a trust of improved real estate. The complaint sought an injunction to restrain the acceptance by the trustee of an offer by the majority beneficiaries to purchase the trust property, and other relief. Plaintiff appeals from a decree of the circuit court of Cook County, entered pursuant to the recommendations of a master in chancery, which directed the trustee to convey the real estate to the majority's nominee. Our jurisdiction is properly invoked because a freehold is involved.

The property which is the *corpus* of this trust is located at the southwest corner of Michigan Avenue and Oak Street in Chicago. It is improved with a three-story shop and office building and two apartment buildings. The equitable interest in the trust is divided into 1400 units of beneficial interest, represented by land trust certificates.

The trust was established in 1925 to hold title to the property subject to a 99-year lease to the Edith Rockefeller McCormick trust. The tenant defaulted during the depression. By a decree of the circuit court of Cook County entered March 22, 1939, in a suit arising as a result of the default in the McCormick lease, the terms of the trust were modified in certain respects. Specifically, the trustee was vested with full and complete authority to sell, lease, operate and otherwise dispose of the real estate. In the event of a proposed sale, however, the decree requires the trustee to notify the beneficiaries and request their advice as to whether the property shall be sold on the terms proposed, and to make reasonable efforts to comply with the expressed advice of the majority of the beneficiaries. In the event that the trustee finds such action impracticable, he is authorized to take whatever action he deems desirable.

In 1947 the trustee entered into a 15-year contract with the firm of Farr, Chinnock & Sampson to manage and rent the property. The firm was to be paid 5 per cent of all rentals collected from the property. In the event of termination of the management contract at any time during the 15-year period the firm was to be paid 5 per cent of all rentals due or to become due on the unexpired term of all leases effected during the period of the agency. The firm was also designated as exclusive broker on any sale of the property. In the event that there was a cooperating broker, it was provided that the brokerage fee should be divided equally.

On April 15, 1954, the trustee notified the beneficiaries

that it had received an offer to purchase the trust real estate from Anthony J. Frystak for the sum of $800,000, that such offer was made on behalf of the owners of 790 of the 1400 units of beneficial interest, and that Ronald J. Chinnock, a partner, and Newton C. Farr, a retired partner, in the firm of Farr, Chinnock & Sampson, managing and selling agents of the trust real estate, were among the certificate holders on whose behalf the offer was made. The notice stated that the brokerage fee, in the estimated amount of $29,000, would be waived in the event of a sale to Frystak, but not in the event of a sale to any other purchaser. The notice further stated that if the management agreement should be terminated by the purchaser, the managing agents would demand payment of the termination penalty, estimated to be about $24,000. The Frystak offer, attached to the notice, reserved the right to meet any higher offer within five days after notification of its terms.

On April 28, 1954, the complaint in this case was filed. It charges that the offer and proposed sale are unfair because (a) the provision giving Frystak the right to meet higher offers will stifle competitive bidding, (b) the insistence by the managing agents on a brokerage fee, in the estimated amount of $29,000, in the event of a sale to anyone but Frystak, is unfair and will discourage other bids, (c) other bids will be discouraged as a result of the managing agents' insistence that the termination penalty be paid by the purchaser in the event that the management contract is terminated, (d) the managing agents, as selling agents, should not be permitted to participate in the purchase of the property, and (e) the majority beneficiaries, in these circumstances, occupy a relation of trust to the minority and should not be permitted to effect a sale to themselves at a discount. The complaint prays that the management agreement be declared invalid and that the

property be sold under the supervision of the court to the highest and best bidder. The complaint also charges that Farr and Chinnock acquired their certificates through the improper use of certain confidential information and prays that the certificates which they acquired be declared to be the property of the trust upon reimbursement of the cost of acquisition.

The answer of Frystak admits that he is the nominee of the majority beneficiaries. The answers of Farr and of Chinnock allege that Farr retired from Farr, Chinnock & Sampson prior to 1947, deny the allegations of impropriety in the acquisition of certificates, admit that they insist upon the penalty if the management agreement is terminated, deny that the "right to meet" provision will stifle competition and assert that the only effect of the waiver of brokerage commissions is to make the Frystak offer equivalent to $829,000.

The answer of the trustee, the La Salle National Bank, alleges that it sought unsuccessfully to have the managing agents assert the termination penalty only against the trust, instead of against any purchasers other than Frystak. It stated that the trustee had also tried unsuccessfully to have Frystak remove the "right to meet" provision, but that it thought higher offers would probably eliminate Frystak from the bidding, and with him this problem. The answer further alleges that the owners of 906 units of beneficial interest have approved selling the trust property for the net sum of not less than $800,000 and that, anticipating this approval, the trustee had arranged to advertise the property for sale prior to the filing of the complaint. The answer sought instructions from the court as to the best method of obtaining the highest price for the property.

On May 5, 1954, the day following the filing of the answers, the trustee petitioned the court to approve the plan of advertising upon which it had already embarked. On presentation and argument of the petition that day, an

order was entered approving the advertising and authorizing the trustee to solicit other offers until June 28, 1954, and to report such other offers to Frystak in accordance with the condition stated in his offer. The order directed that the trustee file a report of the highest offer, and provided that such offer be submitted to the court for approval, before acceptance.

The trustee reported, on July 12, 1954, that it had received 69 inquiries, but had received only one bid, that of Joseph Horwitch, on June 28, 1954, for $824,000, with a waiver of the cooperating brokers' commission, by Arthur Rubloff & Co. The net value of this bid to the estate was reported to be $809,140. Horwitch stated that he would be willing to increase his offer, but was reluctant to do so unless a competitive sale could be arranged on a fixed date. The Horwitch offer was communicated to Frystak who thereupon increased his bid to $825,000, net to the trust, on July 2, 1954. The report of the trustee concluded that the Frystak offer was the best offer received under the terms of the advertising, approved by order of the court of May 5, 1954, which invited offers until June 28, 1954, and allowed Frystak five days to meet the highest offer received.

Plaintiff filed objections to the trustee's report, on July 15, 1954, in which he charged that the trustee's advertising had discouraged competitive bidding because of the "right to meet" provision, which it expressly reserved to Frystak, and because it invited offers on the basis that the majority was entitled to a competitive advantage in the bidding, in the amount of the brokerage fee. The report and objections were referred to a master in chancery. At the master's hearing, Frank G. Price, an assistant vice-president of the trustee bank, testified that he had received 69 inquiries in response to the advertising, that many of those who inquired had objected to the "right to meet" provision, and that in all such cases he had advised those

persons that the best way to eliminate the problem was by driving Frystak out of the competition with higher bids. He stated, however, that many persons lost interest in the property because the foundation of the building did not lend itself to additional construction so as to increase income.

Joseph G. Porter, one of the vice-presidents of the trustee bank, stated that he had had the property appraised at $900,000, just prior to receipt of the Frystak offer, that he had tried to prevail on counsel for Frystak to eliminate the "right to meet" provision from the offer, and that they had referred him to Farr, who refused to do so. Porter testified that one prospect refused to bid because a lease of the main building ran until 1962, and that that was the "real hurdle" to a sale.

Correspondence was introduced in which the trustee sought to have the cost of terminating the management agreement applied only to the trust, and the managing agents insisted that the prospective purchaser would have to bear the cost of terminating the agreement, unless the property was sold subject to the agreement. The trustee contended in its correspondence that a sale subject to the agreement would not bring the best price, since it was likely that most purchasers would want to manage the property themselves and would be reluctant to purchase if there was risk of assertion of the penalty.

Chinnock testified that his firm intended to assert the penalty against any purchaser who did not continue to employ his firm, and that his firm intended to claim the brokerage commission if the property was sold to anyone except Frystak. He further testified that Farr had been retired from Farr, Chinnock & Sampson since 1946, although his name still appears on the letterhead as a "consultant." He admitted that he and Farr, who is his brother-in-law, and their families own over 300 units of beneficial interest in the trust.

In response to the notice to beneficiaries, seeking their advice, it was shown that the owners of 906$\frac{4}{25}$ units indicated approval of the acceptance of the Frystak offer, owners of 38$\frac{11}{25}$ units disapproved, and owners of 410$\frac{5}{25}$ units failed to reply.

It was further shown that the only offer submitted within the period of time fixed by the advertising was the Horwitch offer, on June 28, 1954, in the amount of $824,000, together with a $40,000 cash deposit to secure the bid. When Frystak met this offer, Horwitch, on July 13, 1954, increased his bid to an amount reported by the trustee as $835,000. Thereafter I. S. Kaplan appeared in court and offered to bid $850,000 in a competitive sale under supervision of the court.

The master's report, filed July 22, 1954, found that the majority beneficiaries did not occupy a fiduciary relationship to the minority, and that it was the wish of the majority that the Frystak offer be accepted unless a higher offer could be obtained. It also found that the $825,000 offer of Frystak was fair, and was the best offer submitted within the time limit set in the advertising, which had been approved by the order dated May 5, 1954. The offer of Horwitch, of July 13, was submitted too late, the master concluded.

The decree approved the recommendation of the master that the Frystak offer of $825,000 be accepted, and expressly adopted each of the master's findings and conclusions. At the hearing before the court Frystak was persuaded to increase his offer to $835,000, the amount at which the second Horwitch offer was reported by the trustee. The court thereupon decreed that the Frystak offer be accepted and that the necessary conveyances be executed. The decree reserved jurisdiction to determine the remaining issues in the case.

Plaintiff seeks reversal of the trial court's decree and urges error in the following respects: (1) in directing

acceptance of the Frystak offer and in ordering conveyance of the property to him; (2) in failing to enjoin the sale; (3) in holding the management agreement valid; (4) in compelling the minority to sell to a syndicate organized by the brokers employed to sell the real estate; (5) in holding the majority not to be in a fiduciary relationship to the minority beneficiaries; (6) in holding that the trustee did not violate its duty of impartiality; (7) in dismissing the complaint as amended for want of equity, insofar as it sought to enjoin the sale of the property.

The most significant fact in this case is that Frystak is not a stranger to the property. He is the nominee of the majority beneficiaries of the trust. The property for which he is bidding constitutes the *corpus* of the trust. In the event that he is successful, the trust will terminate. In substance, what the majority is doing is buying out the minority, rather than buying an asset of the trust. The interests of the majority and the minority are completely antagonistic. The one group is interested in obtaining the highest possible selling price while the other group, the majority, wants the lowest.

The dominant persons in the majority group are Farr and Chinnock, who are or have been actively connected with this property for many years. Farr was the trustee of the original lessee of the property, the Edith Rockefeller McCormick trust, and is a consultant to the firm of Farr, Chinnock & Sampson, managing agents of the trust. Chinnock, the brother-in-law of Farr, is a partner in the firm. Farr and Chinnock, together with the members of their families, own 300 units of beneficial interest in the trust. In such a situation a court of equity is alert to see that the utmost good faith and impartiality characterize the transaction. *Chicago Hansom Cab Co.* v. *Yerkes*, 141 Ill. 320; *Straus* v. *Anderson*, 366 Ill. 426.

The management agreement provided: "Should the property * * * be sold while this agreement is in

effect, then Ronald J. Chinnock and Richard H. Sampson, doing business as Farr & Company, shall be exclusive agents for the sale of the property * * *." It also provided that in the event the management agreement should be terminated, the agents would receive five per cent of all rentals received from leases made or renewed by the agents. It is argued that these provisions made the management agreement void, but as we view the case it is unnecessary to determine that question. For even if the provisions of the agreement are assumed to have been valid, the use to which the agreement was put by the managing agents was clearly improper.

The management agreement contemplated disinterested activity in behalf of the trust and all of its beneficiaries. Equity will not permit a position so acquired to be converted into one favorable to some beneficiaries, including the managing agents and members of their families, and hostile to the interests of other beneficiaries. In this case an effort was made to use each of the challenged provisions of the management agreement to provide leverage to assist in the acquisition of the interests of the minority beneficiaries. In neither instance did the trustee effectively challenge the attempt.

With respect to the brokerage commission claimed by the managing agent upon a sale to anyone other than Frystak, the agreement provided that the managing agents "shall be exclusive agents for the sale of the property." The trustee solicited all bids. It may well be that for that reason alone no commission was payable to the managing agents, for a distinction has been drawn between an "exclusive agency" to sell realty and an "exclusive right" to sell such property. In the former situation the owner is not precluded from selling the property himself, but is only barred from appointing another agent, while in the latter case the owner remains liable for the commission even if he effects the sale himself. *Wozniak* v. *Siegle*, 226 Ill. App.

619; 5 Illinois Law and Practice 522; Restatement of the Law, Agency, sec. 449.

It is unnecessary to decide this question, however, because by becoming prospective purchasers the managing agents disqualified themselves from acting as brokers in the solicitation of competing bids. Whatever considerations may have been responsible for incorporating in the management agreement an exclusive selling agency lasting fifteen years, that agreement cannot be read as creating a right in the agent to levy tribute upon a sale which he had disqualified himself from negotiating.

Under these circumstances it was improper for the trustee to take the position that Frystak was entitled to a competitive advantage in the bidding in the amount of the brokerage fee. All competing bids were reported to the court on that basis. It is impossible to determine how many persons may have been deterred from bidding because of this factor. It is also impossible to determine how many beneficiaries, not members of the purchasing group, advised the trustee to proceed with the proposed sale on the ground that it would increase the distributable proceeds, by eliminating the payment of a brokerage fee as an expense of the sale.

With respect to the provision for commissions in the event of termination of the management agreement, the trustee took the position at the outset that the trust, and not the purchaser, would be liable for the termination penalty, since the trustee did not plan to make the sale subject to the management agreement. The managing agents refused to concede this point, and insisted that the purchaser would have the problem of settling the question. At the hearing Chinnock confirmed that his firm intended to insist on the termination penalty against a purchaser desiring to terminate the agreement.

It is easy to understand why the managing agents would want the penalty passed on to the purchaser. If the com-

missions were paid by the trust, a major portion of the cost would be borne by the purchasing group. Further, the threat that the penalty would be asserted would tend to discourage bidding by persons interested in managing the property themselves. As the trustee pointed out in its correspondence with the managing agents, most purchasers would want to manage the property themselves, and it would not produce the best price to offer the property subject to the agreement.

The attempt thus made to assert a claim against competing purchasers was improper. It is true that the trustee's advertising makes no reference to the claim and that inquiries were handled by the trustee, not the managing agents. The notice to the beneficiaries, however, contained a reference to this claim of the managing agents. The trustee now argues that the provision in the notice was merely to advise the beneficiaries of a claim against the trust—and not against the purchaser. Certainly the notice did not expressly so state, and since the position of the managing agents was unequivocal the trustee could hardly have intended to mislead the beneficiaries.

The third restrictive condition complained of is the "right to meet" provision. The evidence of the depressing effect of this condition is clear and direct. The bid which was accepted is $835,000. Horwitch had offered to increase his bid, if the condition complained of were removed and a competitive sale were arranged. Kaplan offered to bid $850,000 in a competitive sale. The trustee acknowledged that there were numerous complaints about the provision from prospective bidders, and that it had tried unsuccessfully to have the provision removed. There is no way of telling how many persons may have failed to reply to the advertising at all because of the condition.

It is argued that the "right to meet" provision is commonly used in sale contracts and has been upheld by the court in *Gumbiner* v. *Alden Inn, Inc.* 389 Ill. 273. The

facts in that case are dissimilar. There the bidder, Lake Shore Hotel Co., which had inserted the "right to meet" provision was a stranger to the selling corporation. There was no conflict of interest between the majority and the minority. The loss of one was the loss of all. The action of those in control of the corporation was taken at the same financial sacrifice that was suffered by the complaining minority. No question involving the duty of impartiality arose.

In the present case, as has been pointed out, the interests of the majority and the minority are antagonistic. In our opinion the trustee violated its duty in allowing the majority the "right to meet" higher offers. The trustee argues that it was necessary to have an opening bid to submit to the beneficiaries and to open the negotiations. Ignoring any effect that reference in the advertising to this right reserved to Frystak might have had on potential bidders, it soon became apparent that the provision seriously affected the bidding, and that a higher price could probably be realized at some type of competitive sale. The trustee, however, adhered rigidly to its original plan for selling the property. In so doing we think that the trustee failed in its duty to deal impartially with the beneficiaries of the trust and to secure the highest price for the property. The evidence fails to show the exercise of that continuous and independent discretion that was required of the trustee at all stages of the transaction. Accordingly, we think that it was error for the chancellor to direct acceptance of the Frystak bid.

Although a court will hesitate to substitute its own discretion for that of a trustee, in our opinion a sufficient showing has been made that the trustee failed to secure the highest obtainable price for the property, and there is sufficient evidence in the record of irregularities attending the solicitation of offers and the conduct of the sale that the chancellor should have denied confirmation of the sale.

The decree of the circuit court of Cook County is reversed and the cause remanded, with directions to proceed in accordance with the views expressed in this opinion.

*Reversed and remanded, with directions.*