KENNEDY, RYAN, MONIGAL AND ASSOCIATES, INC., Plaintiff-Appellee, v. IRVIN B. WATKINS, Defendant-Appellant.

First District (6th Division)   No. 1—91—3618

Opinion filed January 29, 1993.

James D. Montgomery and Jean M. Templeton, both of James D. Montgomery & Associates, of Chicago, for appellant.

Richard E. Steck, of Steck & Spataro, of Chicago, for appellee.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Dr. Irvin B. Watkins (Watkins), appeals from an order granting summary judgment to the plaintiff, Kennedy, Ryan, Monigal & Associates, Inc. (Kennedy), a real estate broker, on a complaint filed by Kennedy against Watkins for commissions allegedly due pursuant to a written agreement.

The complaint was in two counts. Count I alleged that Kennedy procured the tenant that rented Watkins' property. Count II alleged that Kennedy was entitled to a commission under an exclusive leasing agreement even if it did not procure the tenant. The judge entered summary judgment for the plaintiff on both counts. The defendant maintains that he, rather than the plaintiff, was entitled to summary judgment on count I or, alternatively, that questions of fact exist that may not be decided on summary judgment. He also maintains that the judge misconstrued the agreement between the parties as a matter of law and that he, rather than the plaintiff, was entitled to summary judgment on count II also.

Watkins is a practicing dentist who owns and has owned several buildings and properties in Chicago. He bought and sold at least one building before this litigation, and hired two real estate brokerage

firms to sell another building. Both of these listing agreements expired before the property was sold. His dental practice is on the second floor of his building located at 1411 East 53rd Street (1411 Building). This building was formerly a one-story restaurant that Watkins modified in 1988 to have two floors and a basement.

Watkins and Vernon Monigal, a vice-president of Kennedy, discussed the building modification and the possibility of the first floor becoming vacant. Watkins and Monigal had an ongoing business relationship involving real estate since 1980, and Monigal gave Watkins advice regarding the purchase of the 1411 Building. Kennedy, however, was never employed officially by Watkins before the contract at issue in this case.

Kennedy is a Century 21 real estate brokerage firm. Watkins approached Kennedy about listing the first floor of the 1411 Building for lease. Watkins initially discussed the listing with Monigal but never discussed the specific terms of the agreement. On June 23, 1988, Monigal gave Watkins a document titled "Exclusive Leasing Agreement" that both men signed. Watkins read the agreement before he signed it.

The agreement was prepared by Kennedy on its letterhead. It is dated June 23, 1988, and provides in part as follows:

> "In consideration of the following agreements and of your efforts to procure tenants for *** 1411 East 53rd Street, Chicago, Illinois 60615, First floor only *** you are hereby employed as our exclusive agent with sole authority to advertise and rent said property.
>
> The agency hereby created shall continue to be in force for a period of 180 days from the date hereof.
> ***
> The Owner agrees to pay the Agent for services rendered in procuring tenants for subject property, whether the property is rented by the Agent, or by or through any other person, during the period of this agreement."

Pursuant to this agreement, Kennedy placed a sign with its name and phone number in the window of the 1411 Building. Kennedy sales associate Rosalind Sallee (Sallee) testified in her deposition that she showed the building to a prospective tenant who wanted to put a beauty salon in the building; she also directed other people to look at the building and called Dunkin' Donuts to inform it that the building was for rent. She called Dunkin' Donuts because "off the top of [her] head [she] realized that there was not a Dunkin' Donuts in that area" and she believed the "high traffic" location of the 1411 Building was

an excellent location for a Dunkin' Donuts. She made this call sometime between June 23 and July 22, 1988, but could not remember the exact date.

She first spoke with Jerry Ulrich (Ulrich), Dunkin' Donuts' real estate department manager. She directed him to look at the property. Ulrich told her he drove past the 1411 Building. Ulrich was excited about the idea of opening a Dunkin' Donuts in Hyde Park; he said the 1411 Building would be a good location and directed her to Andy Davis (Davis), who owned Dunkin' Donuts' "territorial rights" for that area of Chicago. Sallee and Watkins both testified that they generally understood these rights to entitle Davis to some of the franchise fee from any new Dunkin' Donuts stores in his area. Sallee called Davis regarding the 1411 Building and directed him to look at it. She never personally took him to the building or met with him regarding the building.

Davis did see the property and subsequently told Sallee that he was not interested in opening a store there due to a lack of parking. Sallee gave Monigal a "notice-of-showing slip" dated August 1, 1988, explaining that Davis had seen the property and that "he was not interested because of parking that is not available." The notice also stated that "[t]oday we submitted [the property] to: Atty. Andy Davis (Dunkin' Donuts)." Sallee gave one copy of this notice to Monigal and mailed the original to Watkins. Sallee explained that, based on the date of the notice, Davis saw the property August 1, 1988. Sallee was informed by the construction workers renovating the 1411 Building that "Dunkin' Donuts was here yesterday."

Sallee produced a note dated August 26, 1988, which indicated that she had spoken to Ulrich and that he had told her that he had met with Watkins about obtaining a Dunkin' Donuts franchise at the 1411 Building. She testified that "we had been—between the three of us, Andy [Davis], Jerry [Ulrich] and myself, we had been keeping in contact regarding the property at 1411 East 53rd Street because it was my concern that we exposed Dr. Watkins to Dunkin' Donuts." Sallee also spoke directly with Watkins about Davis and Dunkin' Donuts on at least two occasions. Monigal once called her into his office while he was on the phone with Watkins and asked her to take the phone and explain to Watkins her actions regarding Davis. She told Watkins that Davis saw the property and that he was not interested due to the lack of parking.

Monigal testified that the only information he had linking Kennedy to Dunkin' Donuts as the tenant at the 1411 Building was the copy of the "notice-of-showing" slip he received and Sallee's

statements that she was "working with Dunkin' Donuts as a prospective tenant."

In his deposition, Watkins testified that Kennedy sent him two memos stating that sales staff showed the 1411 Building to possible tenants. "[S]ometime in August" he received the notice-of-showing slip informing him that Davis had seen the property; he first testified that he remembered that the name Dunkin' Donuts was on the slip, but later said he did not remember if Dunkin' Donuts was listed on the notice. He met Sallee at a meeting in Monigal's office sometime in 1989.

Watkins testified that he first had the idea of placing a Dunkin' Donuts in the 1411 Building while walking his dog through an alley near his home, one block from a Dunkin' Donuts store. This occurred some time before he received the notice from Kennedy and in fact took place before he signed the listing agreement. In June 1988 Watkins "went to the library and got some addresses of several donut shops, and *** sent off for information from Massachusetts, the home office of the Dunkin' Donuts." After signing the listing agreement, Watkins "did a lot of hands-on type activities" such as calling people whom he considered prospective tenants.

Watkins explained that he first learned about Davis and territorial rights after he received a letter from Monigal on March 7, 1989. Watkins said that the letter, which he characterized as an accusation on the part of Monigal against him, convinced him to call Larry Petrus (Petrus) at the Park Ridge, Illinois, office of Dunkin' Donuts. Watkins testified that all of his negotiations with Dunkin' Donuts were with Petrus; the August 1, 1988, notice from Sallee that she had shown the property to Davis made him curious and caused him to call Petrus.

Petrus gave Watkins the franchise agreement and discussed it with him several times, although Watkins stated that the agreement itself was nonnegotiable. Petrus also explained territorial rights to Watkins. Watkins' business partner, a college friend named Wanda Young Wilson (Wilson), accompanied Watkins to Petrus' office. Watkins met Ulrich at Petrus' office; he thought Ulrich saw the property sometime in July. Ulrich also explained generally what Davis' territorial rights entailed. A letter dated August 4, 1988, from Ulrich to Wilson indicates that Ulrich previously saw the property and notes that Ulrich gave Petrus a franchise questionnaire from Wilson and Watkins. In this letter, Ulrich states that "[i]t was a pleasure meeting with you and Dr. Watkins on Tuesday." The Tuesday before August 4, 1988, was August 2.

Watkins testified that in December 1988 or January 1989 he formed a corporation with Wilson. They each own 50% of the stock in the corporation, 2W, Inc. 2W, Inc., executed a lease dated December 1, 1988, with Watkins for the first floor of the 1411 Building. The listed purpose of the lease is to operate a Dunkin' Donuts franchise. The lessor is Watkins, the lessee is 2W, Inc., and the lease is signed by Watkins, as lessor, and Wilson as president of 2W, Inc., as lessee. December 1 falls within the 180-day period of the listing agreement. The lease runs from March 1, 1989, to February 28, 1999, at a monthly rent of $2,169. The lease, according to Watkins, was "back dated" December 1 to help him obtain financing. The lease did not provide for a security deposit. In Watkins' mind it was not truly a lease. Watkins does receive the listed monthly rent from the lease, however, and a rider to the lease indicates a security deposit of $5,000. In an affidavit, Watkins referred to 2W, Inc., as "the tenant [to whom] I rented the premises."

On January 20, 1989, Wilson and Watkins executed a franchise agreement with Dunkin' Donuts. Each paid half of the necessary investment, which included a $30,000 franchise fee, $20,000 more than the standard $10,000 fee listed on the January 20, 1989, agreement. Watkins explained that he was not aware when he executed the agreement that the usual fee was $10,000 and that he believed Davis received some of the franchise fee as compensation for Davis' territorial rights.

Kennedy demanded a commission for the lease of the 1411 Building and ultimately filed the complaint which sought $7,848.94 in commissions based on the actual rent amount of the lease.

■ There are three alternative ways a real estate broker may become entitled to a commission. (See *Real Estate Group, Inc. v. Sargent* (N.D. Ill. 1988), 684 F. Supp. 1445 (applying Illinois law and listing all three).) First, the property owner must pay a commission to the broker if the broker presents a "ready, willing and able" lessee or buyer who conforms to the owner's requirements. (*Telander v. Posejpal* (1981), 94 Ill. App. 3d 616, 418 N.E.2d 444.) Second, a broker is entitled to a commission if he has an exclusive leasing or sale agreement with the owner and the property is leased or sold by anyone during the life of the agreement. (*Wozniak v. Siegle* (1922), 226 Ill. App. 619; see also 12 Am. Jur. 2d *Brokers* §226 (1964).) Third, an owner owes a commission to a broker when the broker is the "procuring cause" of a lease or sale. (*Romanek-Golub & Co. v. Anvan Hotel Corp.* (1988), 168 Ill. App. 3d 1031, 522 N.E.2d 1341.) The plaintiff seeks judgment in count II under the second alternative, and in count

I the plaintiff seeks judgment under the third alternative. We have concluded that the judge properly granted summary judgment on count II.

■ Neither party disputes the validity of the listing agreement; the only dispute centers around the construction of that agreement. Where only the construction of a contract is at issue, the legal effect and interpretation of the contract is a question of law, and summary judgment is proper. *Continental Assurance Co. v. Commonwealth Edison Co.* (1990), 194 Ill. App. 3d 1085, 551 N.E.2d 1054.

In interpreting the contract, the court must look to the intent of the parties as evidenced by the contract "as a whole, not merely by reference to particular words or isolated phrases." (*La Throp v. Bell Federal Savings & Loan Association* (1977), 68 Ill. 2d 375, 381, 370 N.E.2d 188, 191.) When the terms of a contract are clear and certain, the contract itself is the only proper evidence of the parties' intent, and the court may not infer that intent which is contrary to the contract's obvious meaning. *La Throp*, 68 Ill. 2d at 384; *Brown v. Miller* (1977), 45 Ill. App. 3d 970, 360 N.E.2d 585.

■ Both parties agree that the issue in this case is whether the agreement is an exclusive agency agreement or an exclusive leasing agreement. The distinction between the two was noted by the supreme court in *Flynn v. La Salle National Bank* (1956), 9 Ill. 2d 129, 139, 137 N.E.2d 71, 76:

> "[A] distinction has been drawn between an 'exclusive agency' to sell realty and an 'exclusive right' to sell such property. In the former situation the owner is not precluded from selling the property himself, but is only barred from appointing another agent, while in the latter case the owner remains liable for the commission even if he effects the sale himself. *Wozniak v. Siegle* [1922], 226 Ill. App. 619; 5 Ill. Law and Practice 522; Restatement of the Law, Agency, sec. 449."

*Wozniak v. Siegle*, the case cited in *Flynn v. La Salle National Bank*, is the case upon which Watkins relies. He maintains that the facts of this case are controlled by the facts of *Wozniak*, in which the appellate court held as a matter of law that the contract between the broker and the seller of the property was an exclusive agency agreement rather than an exclusive sale agreement.

The agreement in *Wozniak* provided that the plaintiff broker was an "exclusive agent" of the defendant owner and that the broker would receive a commission if the property was sold during the term of the agreement "either through [the plaintiff] or any other person." (*Wozniak*, 226 Ill. App. at 619-20.) The owner ultimately sold the

property himself with no assistance from the broker and refused to pay a commission. The appellate court held that the agreement created only an exclusive agency, explaining that under agency law the phrases "exclusive agent" and "any other person" could be read consistently only if the owner himself, as the principal, was not included in the phrase "any other person," and thus did not give up the right of a principal to act for himself. The court noted that an owner could relinquish this right through words or conduct. *Wozniak*, 226 Ill. App. at 622.

Several appellate court cases have discussed the distinction between an exclusive agency agreement and an exclusive sale or lease agreement. (See *Hammel v. Ruby* (1985), 139 Ill. App. 3d 241, 487 N.E.2d 409; *Bolger v. Danley Lumber Co.* (1979), 77 Ill. App. 3d 207, 395 N.E.2d 1066; *Brown v. Miller* (1977), 45 Ill. App. 3d 970, 360 N.E.2d 585; see also *Bass v. Banga* (N.D. Ill. 1987), 656 F. Supp. 312 *aff'd* (7th Cir. 1988), 857 F.2d 1476 (Table).) In each of the appellate court cases and in the Federal case, the agreement expressly provided that the commission would be due the broker if the property was sold by the owner of the property. Consequently, those cases do not assist the plaintiff's position in the case before us. On the other hand, none of those cases held that an agreement will be construed to be an exclusive agency agreement unless the agreement expressly provides that a commission is due if the owner of the property effects the sale.

■ We believe that the agreement in the case before us is significantly factually dissimilar to the agreement in *Wozniak* and that the judge properly construed the agreement to be an exclusive agreement to lease the property. To begin, the contract is captioned "Exclusive Leasing Agreement." We infer that the agreement in *Wozniak* was not entitled an "Exclusive Sales Agreement." We recognize that the caption of an instrument does not necessarily determine its meaning. (*Bonde v. Weber* (1955), 6 Ill. 2d 365, 128 N.E.2d 883.) But we have found no case which says that the caption or title of an instrument is to be ignored in the construction of the instrument. We believe that the caption, "Exclusive Leasing Agreement," should be considered along with all the other language of the agreement in determining what the parties intended. The agreement also provided that the plaintiff was "hereby employed as our exclusive agent *with sole authority* to advertise and rent said property." (Emphasis added.) Similar language was not present in the agreement in *Wozniak*. We judge that the caption of the agreement and language giving the plaintiff "sole authority to advertise and rent" the property manifested an intent on the part of Watkins to surrender his own right to lease the

property. For that reason we hold that the judge properly granted summary judgment in favor of the plaintiff on count II of the complaint. In view of our holding it is unnecessary to determine whether the judge properly entered summary judgment on count I.

The judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.