In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2164

Beanstalk Group, Inc.,

Plaintiff-Appellant,

v.

AM General Corporation and General Motors
  Corporation,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 00 C 525--Allen Sharp, Judge.

Argued January 7, 2002--Decided March 15, 2002


  Before Posner, Rovner, and Evans, Circuit
Judges.

  Posner, Circuit Judge.  Beanstalk, which
serves owners of intellectual property by
negotiating licenses of their property,
brought this diversity suit for breach of
its contract with AM General; the
substantive issues are governed by the
law of Indiana. The contract, called a
"representation agreement," appointed
Beanstalk an agent of AM General to
obtain licenses to use the latter's
"HUMMER" trademark. When the contract was
made in 1997, AM General was the
manufacturer of the Humvee, a military
vehicle that is the successor to the jeep
and like the jeep is also sold in a
version intended for the civilian market,
under the name "Hummer." Beanstalk named
General Motors as an additional defendant
for reasons that will appear in a moment.
The district judge granted the
defendants' motion to dismiss the
complaint (to which Beanstalk had
attached the representation agreement)
for failure to state a claim. Fed. R.
Civ. P. 12(b)(6). Since the
representation agreement was part of a
pleading rather than submitted
separately, the judge could consider it
without converting the defendants' motion
to one for summary judgment. Fed. R. Civ.
P. 12(c); Berthold Types Ltd. v. Adobe
Systems Inc., 242 F.3d 772, 775 (7th Cir.

2001).

The agreement made Beanstalk AM General's "sole and exclusive non-employee representative" for the purpose of licensing the Hummer trademark and entitled Beanstalk to 35 percent of the "gross receipts . . . received on Owner's [AM General's] behalf . . . under any License Agreements" made while the representation agreement was in force. Each license agreement "shall provide for all payments thereunder to be made to Beanstalk on Owner's behalf," and Beanstalk is required to account quarterly to AM General for "all gross receipts actually received during the preceding calendar quarter under any License Agreements." AM General is given "the absolute right to veto, without cause and at its sole discretion," any proposed license, including renewals. "License agreement" is defined as "any agreement or arrangement, whether in the form of a license or otherwise, granting merchandising or other rights in the Property," which in turn is defined to mean trademarks and related rights. The contract, which is assignable (though by Beanstalk only with AM's consent) and contains an integration clause, was to continue until the end of 2000.

The agreement was drafted by Beanstalk, but this fact has little interpretive significance since AM General is a commercially sophisticated party represented by counsel. Most courts now agree with this exception to the principle that contracts are to be construed against the party that drafted it. Western Sling & Cable Co. v. Hamilton, 545 So. 2d 29, 31-32 (Ala. 1989); Wood River Pipeline Co. v. Willbros Energy Services Co., 738 P.2d 866, 872 (Kan. 1987); Kinney v. Capitol-Strauss, Inc., 207 N.W.2d 574, 577 (Iowa 1973); Dawn Equipment Co. v. Micro-Trak Systems, Inc., 186 F.3d 981, 989 n. 3 (7th Cir. 1999); Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co., 924 F.2d 633, 638-39 and n. 6 (7th Cir. 1991); Missouri Pacific R.R. v. Kansas Gas & Electric Co., 862 F.2d 796, 799-800 (10th Cir. 1988); First State Underwriters Agency of New England Reinsurance Corp. v. Travelers Ins. Co., 803 F.2d 1308, 1311-12 (3d Cir. 1986); Eagle Leasing Corp. v. Hartford Fire Ins. Co., 540 F.2d 1257, 1261 (5th Cir. 1976).

There are holdouts, illustrated by Eastern Bus Lines, Inc. v. Board of Education, 509 A.2d 1071, 1073-74 (Conn. App. 1986), where the court, quoting an earlier opinion, said that "the party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests." No doubt; but the other party, if commercially sophisticated and represented by counsel, will insist on clarification. Indiana has yet to take a stand on the exception, though the only case from Indiana that we can find which bears on it, Nationwide Mutual Ins. Co. v. Neville, 434 N.E.2d 585, 599 (Ind. App. 1982), leans in favor of rejecting it. No matter; AM does not need the rule in order to prevail. We add that the rule is in practice a makeweight rather than a tie breaker.

Beanstalk set about obtaining agreements for the licensing of the Hummer trademark. In 1999, however, two years into the representation agreement with Beanstalk, AM General entered into a joint-venture agreement with General Motors under which GM would design and engineer a new version of the Hummer, would make an interest-free loan of $235 million to AM General for the construction of a factory to manufacture the new version, would promise to buy a minimum number of the new vehicles, would obtain an option to buy up to 40 percent of AM General's common stock--and would acquire the Hummer trademark. GM informed Beanstalk that it had not assumed any of AM General's obligations under the representation agreement and that it would not compensate Beanstalk for any license agreements made or renewed after the effective date of the joint-venture agreement.

Beanstalk argues that the agreement between AM General and GM, although of course not labeled a license agreement, was one because it transferred the Hummer trademark to GM and thus was an "agreement or arrangement, whether in the form of a license or otherwise, granting merchandising or other rights in the Property"; for the transfer gave GM the right, indeed the exclusive right, to merchandise the Hummer trademark, that

is, the "Property." The contract thus is clear, Beanstalk argues--the joint venture was an "agreement" that "grant[ed]" GM "merchandising . . . rights" in the Hummer trademark and it did not have to be "in the form of a license" because the representation agreement says "in the form of a license or otherwise"--and under accepted principles of contract law we should look no further. Beanstalk wants 35 percent of so much of the consideration running from GM to AM General as represents the value of the Hummer trademark. We do not know what the consideration was, or what that value is, because no evidence has been taken--in fact, the joint-venture agreement is not even in the record, though the sketch we have just given of its terms is not contested.

Beanstalk is correct that written contracts are usually enforced in accordance with the ordinary meaning of the language used in them and without recourse to evidence, beyond the contract itself, as to what the parties meant. This presumption simplifies the litigation of contract disputes and, more important, protects contracting parties against being blindsided by evidence intended to contradict the deal that they thought they had graven in stone by using clear language. It is a strong presumption, motivated by an understandable distrust in the accuracy of litigation to reconstruct contracting parties' intentions, but it is rebuttable--here by two principles of contract interpretation that are closely related in the setting of this suit. The first is that a contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek. USA Life One Ins. Co. of Indiana v. Nuckolls, 682 N.E.2d 534, 539 (Ind. 1997); Haworth v. Hubbard, 44 N.E.2d 967, 970 (Ind. 1942); Merheb v. Illinois State Toll Highway Authority, 267 F.3d 710, 713 (7th Cir. 2001); Funeral Financial Systems v. United States, 234 F.3d 1015, 1018 (7th Cir. 2000); Grun v. Pneumo Abex Corp., 163 F.3d 411, 420 (7th Cir. 1998); Catalina Enterprises, Inc. Pension Trust v. Hartford Fire Ins. Co., 67 F.3d 63, 66 (4th Cir. 1995).

This is an interpretive principle, not a species of paternalism. "The letters between plaintiff and defendant were from one merchant to another. They are to be read as businessmen would read them, and only as a last resort are to be thrown out altogether as meaningless futilities. . . . If literalness is sheer absurdity, we are to seek some other meaning whereby reason will be instilled and absurdity avoided." Outlet Embroidery Co. v. Derwent Mills, 172 N.E. 462, 463 (N.Y. 1930) (Cardozo, C.J.). "There is a long tradition in contract law of reading contracts sensibly; contracts--certainly business contracts of the kind involved here--are not parlor games but the means of getting the world's work done. . . . True, parties can contract for preposterous terms. If contract language is crystal clear or there is independent extrinsic evidence that something silly was actually intended, a party may be held to its bargain, absent some specialized defense." Rhode Island Charities Trust v. Engelhard Corp., 267 F.3d 3, 7 (1st Cir. 2001); see also Dispatch Automation, Inc. v. Richards, No. 01-2273, 2002 WL 221755 at *2-3 (7th Cir. Feb. 11, 2002).

The second principle is that a contract must be interpreted as a whole. Freigy v. Gargaro Co., 60 N.E.2d 288, 291 (Ind. 1945); Harseim v. Booth, 33 N.E. 1016, 1017 (Ind. 1893); Allstate Ins. Co. v. Hammond, 759 N.E.2d 1162, 1168 (Ind. App. 2001); United States v. Schilling, 142 F.3d 388, 395 (7th Cir. 1998); LaSalle National Trust, N.A. v. ECM Motor Co., 76 F.3d 140, 144 (7th Cir. 1996); A.D.E. Inc. v. Louis Joliet Bank & Trust Co., 742 F.2d 395, 396 (7th Cir. 1984); Catalina Enterprises, Inc. Pension Trust v. Hartford Fire Ins. Co., supra, 67 F.3d at 66. Sentences are not isolated units of meaning, but take meaning from other sentences in the same document.

The second principle thus is linguistic; the first reflects the fact that interpretation is a cultural as well as a linguistic undertaking. To interpret a contract or other document, it is not enough to have a command of the grammar, syntax, and vocabulary of the language in which the document is written. One must know something about the practical as well as the purely verbal context of the language to be interpreted. In the case of a commercial contract, one must have a

general acquaintance with commercial practices. This doesn't mean that judges should have an M.B.A. or have practiced corporate or commercial law, but merely that they be alert citizens of a market-oriented society so that they can recognize absurdity in a business context. A blinkered literalism, a closing of one's eyes to the obvious, can produce nonsensical results, as this case illustrates. Beanstalk is in the business of merchandising trademarks. If, while the representation agreement was in effect, a toy company wanted to make a toy Hummer, Beanstalk was authorized to grant the toy company a license in exchange for a fee that it would split 35/65 with AM General. The joint-venture agreement was not that kind of arrangement. It was not an arrangement for the promotion of AM General's trademark. By the agreement creating the joint venture, AM General essentially transferred the Hummer business to General Motors, retaining a role limited to manufacturing, in a factory built with GM's money, a vehicle designed by, engineered by, and to be marketed by (that is the significance of the transfer of the trademark) GM. Quite apart from the option that GM also received to buy a large, doubtless controlling interest in AM General, it's as if AM General had sold its entire business, including its manufacturing assets and all its trademarks, to GM.

Beanstalk is not a business broker. It had nothing to do with the joint venture and indeed didn't even know about it until after it took place. The parties could hardly have intended that Beanstalk should get a commission if AM General decided, as in effect it did, to get out of the Hummer business. A business would not contract to pay an agent for work that the agent did not do but that the business did itself. Beanstalk and AM General must have known when they signed the representation agreement that if AM General ever sold its Hummer business, the trademark would go with it, as the purchaser would need it in order to identify the product, while AM General would no longer have any need or use for it. Indeed, AM General would have nothing to attach the trademark to--and a trademark is an identifier, not a free-standing piece of intellectual property; hence the rule that a trademark cannot be

sold in gross, that is, without the assets that create the product that it identifies. 15 U.S.C. sec. 1060; United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97 (1918); In re Cult Awareness Network, Inc., 151 F.3d 605, 608 n. 1 (7th Cir. 1998); Green River Bottling Co. v. Green River Corp., 997 F.2d 359, 362 (7th Cir. 1993); Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 956 (7th Cir. 1992); Beauty Time, Inc. v. VU Skin Systems, Inc., 118 F.3d 140, 150 (3d Cir. 1997). The parties would hardly have intended Beanstalk to obtain a commission on the sale of the business merely because the sale would inevitably include the trademark. And they would not have wanted to burden the sale with the added cost of allocating the purchase price between the trademark and the other assets involved in the sale, as Beanstalk claims they must do in order to compute the commission to which it is entitled on the joint venture. (Such allocations may be required for tax purposes. See Thrifticheck Service Corp. v. Commissioner, 287 F.2d 1, 2, 3-4 (2d Cir. 1961) (Friendly, J.). We are not told whether that was the case with the AM General-GM joint venture.)

The unreasonableness of Beanstalk's position can be seen most clearly by imagining that the joint venture had taken place the day after the representation agreement between Beanstalk and AM General went into effect. Then on Beanstalk's interpretation it would be entitled to 35 percent of the entire value of the Hummer trademark even though it had made absolutely no contribution to that value. That makes no sense; it is apparent that the definition of "License Agreement" in the representation agreement covers any agreement that has the function or character of a trademark licensing agreement even if the word "license" or a cognate term does not appear; the sale of a business is an agreement of an entirely different character. "[The] issue of whether a transfer of the use of a trademark is a sale or a license for tax purposes is a thorny one, and has not always been consistently solved in the courts. The basic problem is to determine the extent to which the transferor retains proprietary rights in the transferred asset. If the transferor retains sufficient proprietary rights,

the transfer must be considered a license rather than a sale. . . . We do not sug gest that [the] nomenclature [used in the contract] should be finally determinative of the distinction between a license and a sale." Consolidated Foods Corp. v. United States, 569 F.2d 436, 437, 442 (7th Cir. 1978). Indeed not.

Beanstalk ignores relevant provisions of the contract, one of which engages Beanstalk to be AM General's "sole and exclusive non-employee representative," implying that AM General's employees can negotiate license agreements without going through Beanstalk. Beanstalk agrees with this interpretation, as it must (there is no possible ambiguity), but claims that even when an employee of AM General negotiates such an agreement with no involvement by Beanstalk, Beanstalk is entitled to 35 percent of the revenues that AM General obtains under the agreement. No reason is given why AM General would compensate Beanstalk for services rendered wholly by AM General's own employees, whom it must compensate. That would be paying double for the same service.

Further ignored are the provisions keying Beanstalk's commissions to gross receipts "received"--obviously by Beanstalk--"on Owner's [that is, AM General's] behalf" and requiring Beanstalk to account to AM General periodically for the gross receipts of the license agreements. This implies that Beanstalk would receive receipts only for license agreements that it negotiated. The implication is reinforced by the fact that the representation agreement contains no provision for compensating Beanstalk out of receipts received directly by AM General, for example under a license agreement negotiated by an employee of AM General.

Beanstalk goes so far as to argue that, whoever negotiates the license agreement, the receipts generated by it must be paid in the first instance to Beanstalk to enable it to take its 35 percent cut off the top. Beanstalk thus is arguing that not 35 percent but 100 percent of so much of the consideration that GM paid AM General for the joint-venture agreement that represented the value of the Hummer trademark had to be paid to Beanstalk. Beanstalk's argument amounts to saying

that if Chrysler hired it to license the Chrysler trademarks and then sold its entire automobile business to Daimler for $10 billion, Beanstalk would be entitled to an immediate cash receipt of $3.5 billion, from which it would deduct 35 percent of the value of the Chrysler trademarks and then remit the balance to Chrysler. Absurd.

Against all this it might be argued that to disregard a contractual term, whether on the basis that interpreting it literally would yield absurd results or that other terms in the contract alter the disputed term's apparent meaning, requires evidence and thus cannot be done on a motion to dismiss. Not so. For when we said earlier that the interpretation of a contract is a cultural as well as a linguistic undertaking, we did not add that the materials of interpretation are limited to literal meanings on the one hand and trial-type evidence on the other. The cultural background that a judge brings to the decision of a contract case includes as we said a general knowledge of how the world operates, including the commercial world, and this knowledge, precisely because it is general rather than being knowledge of the specific facts of the case ("adjudicative facts"), can show that the literal interpretation of a particular contractual term would be unsound, in which event no evidence need be taken. Unelko Corp. v. Prestone Products Corp., 116 F.3d 237, 240 (7th Cir. 1997).

It would be different if Beanstalk, instead of standing on the literal terms of the representation agreement--onquicksand, in other words--wanted to present evidence to show that the agreement means what it says it means. The only evidence it wants to present is that before selling the Hummer business to GM, AM General approached Beanstalk and asked for an express exclusion from the representation agreement of any agreement "for the purpose of producing motor vehicles" even if such an agreement included a transfer of trademark rights. But of course. It was simple prudence for AM General to try to head off this lawsuit. It doesn't follow that the lawsuit has any merit. Indeed, to penalize AM General for attempting an amicable resolution of a potential dispute in advance would violate the

spirit of the rule that makes settlement offers inadmissible in an adjudication on the merits. See Fed. R. Evid. 408.

With our conclusion that there was no breach of contract, Beanstalk's other claims collapse, though not, as the defendants argue, because they are sketchily alleged. Federal pleading rules, which require that a complaint only give notice of the plaintiff's claim, and not that it spell out the facts underlying the claim, Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993); Kirksey v. R.J. Reynolds Tobacco Co., 168 F.3d 1039, 1041 (7th Cir. 1999) ("all that's required to state a claim in a complaint filed in a federal court is a short statement, in plain (that is, ordinary, nonlegalistic) English, of the legal claim. . . . The courts keep reminding plaintiffs that they don't have to file long complaints, don't have to plead facts, don't have to plead legal theories"), govern even in diversity suits. Johnson v. Hondo, Inc., 125 F.3d 408, 417 (7th Cir. 1997); Colton v. Swain, 527 F.2d 296, 304 (7th Cir. 1975). And while we are about correcting the defendants, we point out that AM General is incorrect to argue that an appellate court is to give weight to the district court's interpretation of the law of the state in which the district court is located. Leavitt v. Jane L., 518 U.S. 137, 145 (1996) (per curiam); Salve Regina College v. Russell, 499 U.S. 225, 231 (1991); Triple G Landfills, Inc. v. Board of Commissioners, 977 F.2d 287, 291 (7th Cir. 1992).

GM cannot be guilty of tortious interference with Beanstalk's contract with AM General when GM did not "interfere" with it, that is, procure a breach, though the defendants are wrong to argue that Indiana requires that the interference be "malicious"; it's enough if it's intentional and unjustified. Winkler v. V.G. Reed & Sons, Inc., 638 N.E.2d 1228, 1235 (Ind. 1994); Zemco Mfg., Inc. v. Navistar Int'l Transportation Corp., 186 F.3d 815, 822–23 (7th Cir. 1999) (Indiana law). The word "malicious" does appear in a few cases, such as Morgan Asset Holding Corp. v. CoBank, ACB, 736 N.E.2d 1268, 1272 (Ind. App. 2000), but it is apparent that the "malice" to which it refers, as in

the cases that require proof of "actual malice" in a defamation suit by a public figure, is intentionality rather than ill will. See Flintridge Station Associates v. American Fletcher Mortgage Co., 761 F.2d 434, 441 (7th Cir. 1985).

Neither defendant can be guilty of unjust enrichment either. When a contract defines the relationship of two parties, termination without fault is a defense to a claim of unjust enrichment, Bayh v. Sonnenburg, 573 N.E.2d 398, 409 (Ind. 1991); Boushehry v. Ishak, 550 N.E.2d 784, 787 (Ind. App. 1990); Murray v. Abt Associates, Inc., 18 F.3d 1376, 1379 (7th Cir. 1994), unless part or full performance by one party has resulted in the conferral of uncompensated values on the other party. That often happens when a contract is voided under the statute of frauds after performance by one party but before payment by the other. Hensley v. Hilton, 131 N.E. 38, 40 (Ind. 1921); Wallem v. CLS Industries, Inc., 725 N.E.2d 880, 887, 890 (Ind. App. 2000); Fischer v. First Chicago Capital Markets, Inc., 195 F.3d 279, 283 (7th Cir. 1999). In such a case the performing party is entitled to the fair value of his performance. There is nothing like that here. Beanstalk received the full consideration for which it had negotiated, namely 35 percent of the gross receipts of the license agreements that it negotiated.

As for GM's having told Beanstalk that it will not pay any commissions on license agreements that are renewed, GM was entitled as the owner of the "Property" to veto any license agreements, including renewals, that Beanstalk might propose. Even if GM remains bound by the representation agreement, which it does not, because the agreement did not require AM General to assign its duties under it to an assignee of the "Property" covered by the agreement, the veto power granted the represented party excuses GM from any duty to renew any license agreements negotiated by Beanstalk.

Affirmed.

Rovner, Circuit Judge, dissenting in part. I believe the majority has strayed

beyond the bounds of Rule 12(b)(6) in affirming the dismissal of Beanstalk's breach of contract claim, and I therefore respectfully dissent. At this stage of the proceedings, we must accept all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993); Slaney v. The International Amateur Athletic Federation, 244 F.3d 580, 597 (7th Cir. 2001), cert. denied, 122 S. Ct. 69 (2001); Camp v. Gregory, 67 F.3d 1286, 1290 (7th Cir. 1995), cert. denied, 517 U.S. 1244 (1996). We are obliged to allow the case to proceed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. Pokuta v. Trans World Airlines, Inc., 191 F.3d 834, 839 (7th Cir. 1999). The majority proceeds down two paths to conclude that Beanstalk's claim fails as a matter of law, but I believe that, at most, these paths lead to the conclusion that the contract is ambiguous, and we must therefore look to extrinsic evidence to determine the intention of the contracting parties.

We all seem to agree that, when read literally, the contract clause defining "License Agreement" would include AM General's sale of its Hummer business, including the "Hummer" and "Humvee" trademarks, to General Motors. The majority holds that we may disregard the literal interpretation of a single clause whenever (1) this literal reading would produce absurd results, or (2) when the isolated clause takes on a different meaning when viewing the contract as a whole. I have no quarrel with either proposition as a correct statement of the law of contracts in Indiana, the relevant jurisdiction here. However, I do not agree that a literal interpretation of the defined term "License Agreement" would necessarily lead to absurd results. Moreover, when the contract is read as a whole, that term is at worst ambiguous. Under these circumstances, dismissal for failure to state a claim is inappropriate because there may be some set of facts that Beanstalk could prove which would entitle it to relief.

I foresee two problems with the

application of the "absurd results" rule in this case. First, and most importantly, we come to this case not after trial or even on summary judgment after a full and fair airing of the relevant facts through discovery, but rather on a motion to dismiss. It is probably no coincidence that nearly every case on which the majority relies for the "absurd results" rule is on appeal from either a summary judgment ruling or a trial. See USA Life One Ins. Co. of Indiana v. Nuckolls, 682 N.E.2d 534, 536 (Ind. 1997) (summary judgment); Haworth v. Hubbard, 44 N.E.2d 967, 968 (Ind. 1942) (trial); Merheb v. Illinois State Toll Highway Authority, 267 F.3d 710, 711 (7th Cir. 2001) (summary judgment); Funeral Financial Systems v. United States, 234 F.3d 1015, 1017 (7th Cir. 2000) (summary judgment); Grun v. Pneumo Abex Corp., 163 F.3d 411, 419 (7th Cir. 1998), cert. denied, 526 U.S. 1087 (1999) (summary judgment); Rhode Island Charities Trust v. Engelhard Corp. 267 F.3d 3, 4 (1st Cir. 2001); Catalina Enterprises, Inc. Pension Trust v. Hartford Fire Ins. Co., 67 F.3d 63, 64 (4th Cir. 1995), cert. denied, 517 U.S. 1105 (1996) (summary judgment); Dispatch Automation, Inc. v. Richards, 2002 WL 221755 at *1 (7th Cir. Feb. 11, 2002) (summary judgment). In the one case decided on a motion to dismiss, the motion was denied and that denial affirmed, meaning the case was allowed to move forward to discovery and trial. See Outlet Embroidery Co. v. Derwent Mills, 172 N.E. 462 (N.Y. 1930) (Cardozo, C.J.). The value of discovery in these circumstances cannot be overstated. Beanstalk, in making a cross-motion for summary judgment, submitted an affidavit which calls into question the majority's conclusion that a literal reading of the "License Agreement" provision leads to an absurd result. In the affidavit, Beanstalk reveals, and AM General does not dispute, that shortly before AM General sold the Hummer business to General Motors, AM General asked Beanstalk to modify the contract. In particular, AM General sought to expressly exclude certain types of transactions relating to the transfer of rights in the trademark, including"agreements between [AM General] and any individual or entity, for the purpose of producing motor vehicles or motor vehicle parts and accessories, even

if rights in the [trademarks] are licensed, transferred, or otherwise involved in such agreements." R. 24, Exhibit B, at para. 1(c). In other words, AM General seems to have well understood the contract to include the sale of its Hummer business, and wished to avoid paying Beanstalk 35% of the value of the trademarks in the sale. Beanstalk declined to make this change, and now, even though both of the parties seem to have assumed the contract covered, or potentially covered the sale to GM, the majority finds this to be an absurd conclusion. See R. 24, Exhibit C. Certainly it might have been poor judgment for AM General to have agreed to this term, and AM General no doubt wishes to disown this language now that it is in litigation. But we do not normally protect parties from the consequences of entering into bad deals except when the contract is unconscionable and the party being held to it is unsophisticated. Operating Engineers Local 139 Health Benefit Fund v. Gustafson Const. Corp., 258 F.3d 645, 650 (7th Cir. 2001) ("People generally are held to the agreements they sign and are not permitted to fob them off as 'boilerplate' without invoking fraud, unconscionability, or mutual mistake as a ground for walking away from their contract."). I doubt AM General needs our protection.

Second, in the absence of discovery, the majority substitutes its own "cultural understanding," its own "cultural background," and its own general knowledge of the commercial world for a defined term in the contract, a dubious proposition at best. Judges are trained in law, not business, and however cosmopolitan we may be about the world of commerce, I think it an unwise practice to substitute our general knowledge of the business world for the express terms of a contract, especially in the absence of any discovery that might elucidate the parties' true intent. Beanstalk's affidavits reveal not only that AM General sought to change the terms of the contract to exclude the sale at issue here, but also that in early negotiations, Beanstalk explained to AM General that it expected a share of any license agreements that internal employees of AM General negotiated. See R. 24, at para. 4. The majority dismisses

Beanstalk's interpretation of this term, arguing that this would be paying double for the same services. On this 12(b)(6) motion, however, we have no idea what the parties bargained for. Beanstalk could well have accepted a smaller commission than it normally obtains in order to get a cut of the in-house business. Beanstalk has argued on appeal that, because it was generally increasing the value of the trademarks, it was entitled to a share of any transfer of rights in the trademarks, whether or not it was directly involved in negotiating the deal. This explanation is not so absurd that Beanstalk should lose its claim as a matter of law, before we even allow discovery. Indeed, it is not absurd at all. Remember that at this stage of the proceedings, we must sustain the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief.

Finally, even when reading the contract as a whole, I believe the language is at worst ambiguous. The majority deftly points out various terms in the contract that render Beanstalk's interpretation suspect. I agree that when reading the contract as a whole, Beanstalk's claim is weak, and indeed might not survive summary judgment. But Rule 12(b)(6) is not a substitute for summary judgment, and we must avoid the temptation to weed out weak claims by bending the Federal Rules of Civil Procedure past the breaking point. We have acknowledged that the Federal Rules, drafted at a time when our courts were less busy, may not have kept up with the realities of the growth of federal litigation. Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir. 1995). We noted an increasing tendency to bend the Rules to dispose of cases on summary judgment that formerly would have gone to trial, and to dismiss on the pleadings cases that would have gotten at least as far as summary judgment. Id. We drew the line in Jackson to make clear that we will not interpolate a requirement of fact pleading into the federal rules. I believe we should similarly draw the line here to require discovery on the intentions of the contracting parties rather than substituting our own cultural understanding for ambiguous contract terms. Although there is a tension between the definition of License Agreement and other provisions of the

contract, it is not for us to resolve that tension on a motion to dismiss. Therefore, I respectfully dissent from the majority's affirmance of the dismissal of Beanstalk's breach of contract claim. I join the majority's opinion on the unjust enrichment and tortious interference claims.