In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3272

QUALITY OIL, INCORPORATED,

*Plaintiff-Appellee,*

*v.*

KELLEY PARTNERS, INCORPORATED,
d/b/a The Oil Works-Elgin &
The Oil Works-Batavia, Incorporated,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08-cv-05006—**Susan E. Cox**, *Magistrate Judge.*

ARGUED JANUARY 13, 2011—DECIDED SEPTEMBER 19, 2011

Before RIPPLE, EVANS[*], and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. In a loan-and-supply contract,
Quality Oil, Inc., agreed to provide Kelley Partners, Inc.,
with a $150,000 loan that would be gradually forgiven

---

[*] Circuit Judge Terence T. Evans died on August 10, 2011, and
did not participate in the decision of this case, which is being
resolved by a quorum of the panel under 28 U.S.C. § 46(d).

over five years as Kelley Partners purchased specified quantities of motor-oil products from Quality Oil. Kelley Partners stopped buying products from Quality Oil after only two years, so Quality Oil sued for breach of contract. Quality Oil won on summary judgment, and Kelley Partners appealed.

The dispute focuses on the meaning of a handwritten notation the parties added to the typewritten contract. Kelley Partners interprets the handwritten provision to release it from all obligations after five years regardless of how much product it purchased from Quality Oil. This interpretation reads the handwritten provision in isolation and is commercially nonsensical. We affirm.

## I. Background

On July 1, 2003, Quality Oil, an Indiana auto-lubricants distributor for Exxon Mobil Corp., and Kelley Partners, an independent operator of automotive quick-lube facilities in Illinois, entered into a "Product Payback Loan and Supply Agreement." Under the Agreement, which by its terms is governed by Indiana law, Quality Oil agreed to loan Kelley Partners $150,000 "at no cost," and Kelley Partners in turn agreed to purchase its motor-oil requirements from Quality Oil.[1] Specifically, in Paragraph 4 of the Agreement, Kelley Partners agreed to

---

[1] Although the Agreement specified a loan amount of $150,000, Quality Oil contends, and Kelley Partners does not dispute, that the actual amount it loaned to Kelley Partners was $150,500.

> purchase from Quality Oil . . . at least eighty-five percent (85%) of [Kelley Partners'] requirements of motor oils during the term of this Agreement. [Kelley Partners] further agrees to purchase not less than two hundred twenty-five thousand (225,000) gallons of Mobil motor oil and 225,000 Mobil branded filters within 60 months from the date hereof.

Immediately following this language in the typewritten contract is the handwritten notation that is central to Kelley Partners' appeal. It states as follows: "This Supply Agreement will terminate after 225,000 gallons and 225,000 filters of Exxon/Mobil is purchased or 60 months, whichever comes first." The president of Kelley Partners and owner/general manager of Quality Oil initialed this handwritten provision and signed the Agreement in two places.

Paragraph 6 of the Agreement provides for a "Premature Termination Penalty." Under this provision, if Kelley Partners "chooses to prematurely terminate this Agreement (i.e. before [Kelley Partners] purchases 225,000 gallons under Paragraph 4), Quality Oil reserves the right to bill [Kelley Partners] . . . for the unamortized portion of the loan's value as provided on Exhibit A." Exhibit A explains how the Premature Termination Penalty was to be calculated:

> The unamortized val[u]e of the loan will be calculated using 60 months as the term.
>
> $150,000 ÷ 60 months = $2,500.00 [per] month

Any premature penalty will be figured by multiplying the remaining months left on contract times $2,500.00.

　　　i.e. 36 months left on contract x $2,500.00 = $90,000

Finally, Paragraph 7 of the Agreement, entitled "Assignment and Delegation," explains Kelley Partners' obligations if it sold its business:

[Kelley Partners] agrees that its rights and duties provided hereunder shall not be assigned or delegated without the prior written consent of Quality Oil, said consent not to be unreasonably withheld. This Agreement shall be binding and inure to the successors of either party. If [Kelley Partners] transfers any location prior to completing the purchases required under Paragraph 4, the transferee(s) must continue to purchase the products from Quality Oil until the required purchases have been made. If said transferee(s) does not comply with the foregoing, [Kelley Partners] may be liable [for the premature termination penalty] . . . if [Kelley Partners] does not meet the requirements of Paragraph 4 with [Kelley Partners'] remaining locations[].

In July 2005, two years after entering into the Agreement, Kelley Partners made its last purchase of motor-oil products from Quality Oil. Up to that time Kelley Partners had purchased only 55,296 gallons of oil

and 61,551 filters.[2] That month Kelley Partners sold its business without assigning its obligations under the Agreement to its purchaser. On learning of the sale, Quality Oil invoiced Kelley Partners for the unamortized portion of the loan pursuant to the Premature Termination Penalty provision. Kelley Partners refused to pay.

Quality Oil sued for breach of contract in Indiana state court. Following a bench trial, the trial court determined that Kelley Partners had breached the Agreement. Kelley Partners appealed, and the Indiana Court of Appeals vacated the judgment and dismissed the case for lack of personal jurisdiction over Kelley Partners. Quality Oil then refiled its breach-of-contract claim in the Northern District of Illinois based on the diversity jurisdiction. *See* 28 U.S.C. § 1332. The parties consented to proceed before a magistrate judge, *see* 28 U.S.C. § 636(c)(1), and Quality Oil moved for summary judgment. The magistrate judge granted the motion and entered judgment for Quality Oil in the amount of the Premature Termination Penalty, plus prejudgment interest. *See Olcott Int'l & Co., Inc. v. Micro Data Base Sys.*, 793 N.E.2d 1063, 1078 (Ind. Ct. App. 2003) (authorizing prejudgment interest on a breach of contract claim "if the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable").

---

[2] *See* Quality Oil's Local Rule 56.1 Statement of Facts at ¶ 13 and Exhibit A at 5.

## II. Discussion

This case requires us to interpret a written contract, which is a question of law subject to de novo review. *Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 594-95 (7th Cir. 2009). Kelley Partners argues that the literal terms of the handwritten provision—that the "Agreement will terminate after 225,000 gallons and 225,000 filters of Exxon/Mobil is purchased or 60 months, whichever comes first"—negates the language that appears earlier in Paragraph 4, which obligates it to purchase 85% of its supply requirements from Quality Oil. In essence Kelley Partners argues that the hand-written provision relieves it of any liability under the Agreement after 60 months—that is, after July 1, 2008—regardless of the amount of product it purchased from Quality Oil.

Quality Oil maintains that Kelley Partners waived this argument by not making it in the district court. That's not quite true. In its brief in response to Quality Oil's summary-judgment motion, Kelley Partners asserted that the Agreement "terminated by its own terms on or about July 1, 2008." Although this argument was not well-developed, the magistrate judge specifically ad-dressed and rejected it. The judge explained that Kelley Partners' reading of the handwritten provision would "render ineffective" the other provisions in the Agree-ment and did not make sense in light of the Agreement "as a whole." We take this as evidence that the effect of the handwritten provision—which is the only issue

raised on appeal—was sufficiently preserved for review.[3] We therefore proceed to the merits.

To support its interpretation of the handwritten provision, Kelley Partners relies first on Section 26-1-3.1-114 of the Indiana Code. That provision, which governs negotiable instruments, states as follows: "If an instrument contains contradictory terms, typewritten terms prevail over printed terms, handwritten terms prevail over both, and words prevail over numbers." But the Agreement is not a negotiable instrument.[4] This section

---

[3] The magistrate judge rejected other arguments raised by Kelley Partners and also entered summary judgment for Quality Oil on Kelley Partners' counterclaim. These determinations are not challenged on appeal.

[4] Section 26-1-3.1-104(a) defines "negotiable instrument" as

an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

(1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) Is payable on demand or at a definite time; and

(3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain:

(A) An undertaking or power to give, maintain, or protect collateral to secure payment;

(continued...)

of the Indiana Code is therefore inapplicable.

Kelley Partners also cites an Illinois case, *Perry v. Estate of Carpenter*, 918 N.E.2d 1156, 1163 (Ill. App. Ct. 2009), for the proposition that "[g]enerally, where there is a conflict in a contract between handwritten and typed or printed terms, the handwritten terms will be deemed controlling." The Agreement, however, is governed by Indiana law, and in any event, *Perry* is distinguishable. The handwritten notation at issue in *Perry* did not alter the basic purpose of the agreement, which was for the sale of real estate. *Id.* at 1159. The parties' contract included a typewritten term providing for an increase in the buyer's earnest money, which was followed by a line for the parties to insert a date by which this condition was to be performed. But the date line was crossed out by hand, and because of this handwritten strike-through, the Illinois Appellate Court held that the buyer was not required to increase his earnest money. *Id.* at 1163.

The priority that *Perry* and the Indiana Code give to handwritten terms in a contract makes sense when it comes to discrete contractual provisions that do not alter the gist of the contract. Here, in contrast, Kelley Partners' interpretation of the handwritten provision

---

[4] (...continued)

        (B) An authorization or power to the holder to confess judgment or realize on or dispose of collateral; or

        (C) A waiver of the benefit of any law intended for the advantage or protection of an obligor.

destroys the fundamental bargain of this contract: Kelley Partners could retain the $150,000 loan it received from Quality Oil and let 60 months elapse without purchasing *any* of its supply requirements from Quality Oil. This reading violates a basic principle of contract interpretation that contractual provisions are not to be read in isolation. Under Indiana law "phrases [in a contract] cannot be read exclusive of other contractual provisions; rather, the parties' intentions must be determined by reading the contract in its entirety and attempting to construe contractual provisions so as to harmonize the agreement." *Johnson v. Dawson*, 856 N.E.2d 769, 773 (Ind. App. Ct. 2006). Kelley Partners has made no effort to explain how its interpretation of the handwritten provision could be consistent with the contract as a whole.

To be sure, in *Johnson*, on which Quality Oil heavily relies, the Indiana Court of Appeals was addressing a dispute over an ambiguous contract provision; the language of the handwritten provision at issue here is admittedly not facially ambiguous. In relevant part it states that "[t]his Supply Agreement . . . terminate[s] after . . . 60 months," and a terminated contract releases parties from their obligations. As the magistrate judge noted, "when read[] . . . alone, the handwritten . . . portion of the Supply Agreement seems to indicate that Kelley Partners can wait sixty months and allow the Supply Agreement to expire."

Still, the principle that a contract must be interpreted as a whole applies even where the language in the contested contract provision is unambiguous. *Beanstalk Grp.*

*v. AM Gen. Corp.*, 283 F.3d 856, 859-60 (7th Cir. 2002) (applying Indiana law). In *Beanstalk* we noted the established doctrine that "written contracts are usually enforced in accordance with the ordinary meaning of the language used in them." *Id.* at 859. We characterized this as a "strong presumption" designed to prevent "the deal that [the contracting parties] thought they had graven in stone by using clear language" from being upended in litigation. *Id.* But we also observed that the plain-meaning presumption is rebuttable and can be overcome by other equally venerable principles of contract interpretation; we identified two that operate to mediate strict linguistic literalism by taking account of contractual context. *Id.* at 859-60. The first is that "a contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek." *Id.* at 860; *see also BKCAP, LLC v. CAPTEC Franchise Trust 2000-1,* 572 F.3d 353, 359 (7th Cir. 2009); *Utica Mut. Ins. Co. v. Vigo Coal Co.,* 393 F.3d 707, 711 (7th Cir. 2004). The second is the one we have already mentioned: "[A] contract must be interpreted as a whole. . . . Sentences are not isolated units of meaning, but take meaning from other sentences in the same document." *Beanstalk*, 283 F.3d at 860 (citations omitted).

In *Beanstalk* we applied these principles to a contract also governed by Indiana law. Beanstalk Group, a broker of intellectual-property licenses, had a contract with AM General, the manufacturer of Hummer motor vehicles, to help AM General sell licenses to the Hummer trade-

mark. The contract provided that Beanstalk would receive a 35% share of gross receipts on any "arrangement, whether in the form of a license or otherwise, granting merchandising or other rights in" the Hummer trademark. *Id.* at 858 (quotation marks omitted). AM General later entered into a complex $235-million joint venture with General Motors for the design and manufacture of Hummer vehicles. Beanstalk contended that this transaction fell within the literal terms of its contract because the joint venture "grant[ed] GM merchandising . . . rights" in the Hummer trademark. *Id.* at 859. Beanstalk sued, claiming that AM General owed it 35% of the value of the trademark in its joint venture with GM. *Id.*

We held that Beanstalk Group's position was commercially "nonsensical" because Beanstalk was "in the business of merchandising trademarks" and its agreement with AM General concerned only the marketing of licenses in the Hummer trademark, not the manufacture of Hummer motor vehicles themselves. We gave an example of the kind of transaction Beanstalk's agreement with AM General would cover: "If, while the . . . agreement was in effect, a toy company wanted to make a toy Hummer, Beanstalk was authorized to grant the toy company a license in exchange for a fee that it would split 35/65 with AM General." *Id.* at 860. The joint venture between AM General and GM was "not that kind of arrangement"; instead, it "essentially transferred the Hummer [manufacturing] business to" GM. *Id.* at 860-61. We applied the principle of contract interpretation that "'[i]f literalness is sheer absurdity, we are

to seek some other meaning whereby reason will be instilled and absurdity avoided.' " *Id.* at 860 (quoting *Outlet Embroidery Co. v. Derwent Mills*, 172 N.E. 462, 463 (N.Y. 1930) (Cardozo, C.J.)). We held that Beanstalk's interpretation of the contract reflected "[a] blinkered literalism, a closing of one's eyes to the obvious," and produced "nonsensical results." *Id.*

The same is true of Kelley Partners' interpretation of the contract at issue here. It would make no commercial sense for Quality Oil to forgive its loan to Kelley Partners after five years regardless of how much motor-oil product Kelley Partners purchased. This was a loan *and supply* contract, after all. Under Paragraph 4 of the Agreement, Kelley Partners bound itself to purchase at least 85% of its motor-oil needs from Quality Oil during the term of the Agreement. Paragraph 6 and Exhibit A imposed a Premature Termination Penalty on any early termination, and Paragraph 7 required that if Kelley Partners sold its business, it was to assign its obligations to its successor or remain liable under the Agreement. Reading the contract as a whole and harmonizing all of its provisions shows that Kelley Partners' literal interpretation of the handwritten provision is commercially absurd.

Perhaps recognizing as much, at oral argument Kelley Partners shifted its focus, asserting that Quality Oil unreasonably withheld its consent to the assignment of Kelley Partners' obligations under the Agreement, contrary to the requirements of Paragraph 7. Kelley Partners never raised this argument in its briefs; it is

therefore waived. *Valentine v. City of Chicago,* 452 F.3d 670, 680 (7th Cir. 2006) (arguments raised for the first time at oral argument are waived). Waiver aside, it's a baseless, last-ditch argument. At oral argument counsel conceded that Kelley Partners *never asked* for Quality Oil's consent to assign the contract when it sold its business. Consent never sought cannot be unreasonably withheld.

Accordingly, the magistrate judge properly entered summary judgment for Quality Oil. Kelley Partners breached the Agreement when it ceased purchasing from Quality Oil after two years without meeting the 225,000-gallon and 225,000-filter requirements or assigning its obligations to its purchaser. Kelley Partners was therefore on the hook to Quality Oil for the Premature Termination Penalty as provided in the Agreement.

AFFIRMED.