In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 15-3655, 15-3505

SEMIR D. SIRAZI, GREENSTONE CAPITAL, L.L.C., and MARDINI, INC.,

*Plaintiffs-Appellees, Cross-Appellants,*

*v.*

GENERAL MEDITERRANEAN HOLDING, SA, and ORIFARM, SA,

*Defendants-Appellants,*

*and*

NADHMI AUCHI,

*Defendant, Cross-Appellee.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 653 — **William T. Hart**, *Judge.*

———————————

ARGUED MAY 23, 2016 — DECIDED JUNE 20, 2016

———————————

Before BAUER, POSNER, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The *dramatis personae* of this complex commercial case (a diversity suit governed by Illinois

law) are as follows: Plaintiff Sirazi owns or controls the other two plaintiffs, and to simplify we'll treat him as the sole plaintiff. General Mediterranean Holding (usually referred to as GMH) is the principal defendant and appellant and the parent of defendant Orifarm, which has been dissolved and so can be ignored. Defendant Auchi is the owner and board chairman of GMH. A jury awarded Sirazi compensatory damages of $12.9 million against GMH and Auchi together, and punitive damages of $5 million against each of them, although the judge set aside the award against Auchi, precipitating Sirazi's cross-appeal.

Antoin Rezko, who is not a party to the suit but played a key role in the events leading up to it, was until 2006 a highly successful Chicago businessman, specializing in real estate. That year he was indicted for fraud, bribery, and other crimes, and his trial on those charges in 2008 resulted in his being convicted and sentenced to prison.

In the halcyon years that preceded Rezko's fall from grace, Sirazi had helped him finance real estate investments. Among other assists Sirazi had guaranteed a $5 million loan to Rezko from Republic Bank. The loan came due in 2006, when Rezko was, and for several years had been, in default on millions of dollars that he'd borrowed from Sirazi.

A year earlier Rezko had caused a valuable Chicago property that he controlled to be sold to GMH. A company was formed named Riverside District Development, LLC, owned half by GMH and half by Heritage Development Partners, LLC, to hold title to the property. Rezko was the 80 percent owner of Heritage and thus a 40 percent owner of the property, which Heritage was made responsible for managing and developing. The salaries of Heritage's presi-

dent and CEO (Michael Rumman) and general counsel (Edward Wynn) were paid indirectly by GMH, which had moreover expressly approved Heritage's hiring Wynn as general counsel.

In 2006 Sirazi and Rezko signed a settlement agreement in which Rezko agreed that he owed Sirazi $7.7 million. He also agreed to repay his $5 million loan from Republic Bank by May 17 (so that Sirazi's guaranty would be released), though the agreement permitted him in the alternative to negotiate an extension of his loan from Republic Bank or to assign the loan to Mutual Bank and repay it by July 17, though in that event he'd be required to pay Sirazi an additional $100,000 fee. The settlement agreement also gave Sirazi a security interest in all distributions from Rezko's investment in Heritage and committed Rezko to a priority order for paying off debts to Sirazi and other creditors from proceeds of Rezko's investment in Heritage.

In July, having repaid the Republic Bank loan with a loan from Mutual Bank, Rezko defaulted on Mutual's loan, triggering Sirazi's guaranty; Sirazi accordingly paid Mutual $5.1 million. Rezko now owed him $12.9 million: $7.7 million + $5.1 million + $100,000, and with mounting interest on these debts.

Meanwhile GMH had decided that since Rezko was now a criminal defendant, his involvement in Heritage reflected poorly on GMH, which therefore decided to buy him out for a small amount of cash but a large amount of debt forgiveness. There was a certain awkwardness in the decision, given Sirazi's security interest in all distributions from Rezko's investment in Heritage; some of the proceeds of a sale of Rezko's interest in Heritage should therefore have gone to

Sirazi rather than to Rezko to be applied to his debt to GMH. But with the acquiescence and assistance of Heritage general counsel Edward Wynn, it was decided in the presence and with the approval of Auchi, GMH's chairman, that in dealing with Rezko GMH would ignore Sirazi's interest. A strategy memorandum sent by Heritage's president, Rumman, to a senior official of GMH named Al-Miqdadi, advised: "Do nothing with regard to the potential Sirazi claim. … This claim, if made, would be litigated." It *was* made, and it *has* been litigated—in this case.

GMH claims to have been unaware that Rezko had committed to pay Sirazi as soon as he obtained proceeds from selling his Heritage shares. But there was enough evidence to entitle the jury to find that it was aware. Wynn and Rumman had a copy of the settlement agreement, and Wynn emailed Rumman that Rezko could not sell his shares without paying off his obligations to Sirazi. A conference call, with Auchi and Al-Miqdadi participating, was held to discuss the matter. Al-Miqdadi testified that the participants in the call agreed that the settlement agreement was invalid. But the jury was entitled to reject his testimony, and to infer that Wynn had communicated to GMH the opinion stated in his emails that Rezko could not lawfully sell his shares without first repaying Sirazi.

After the conference call Auchi asked GMH's board to approve the decision to buy out Rezko's interest in Heritage, which the board did (unsurprisingly, since Auchi owns 100 percent of GMH). The proceeds of the sale—$31.8 million, though most of it was in debt forgiveness rather than cash— would, had they been cash, have been more than sufficient to repay Sirazi the entire $12.9 million that Rezko owed him;

and that was the amount the jury awarded Sirazi in compensatory damages.

All this makes the jury's verdict against GMH seem unexceptional; and most of GMH's contrary arguments, which are both hypertechnical and more suitable for resolution by a factual inquiry at a trial than on appeal, do not require discussion. But two do. Both are based on a provision of the settlement agreement between Sirazi and Rezko which states that "within three (3) days following Rezko's receipt of all or any portion of the Distributions [a term so broadly defined in the agreement as to encompass all proceeds from the sale of Rezko's shares of Heritage], Rezko shall pay, apply and disburse such distributions as follows:" first, repayment of the loan that Republic Bank had made to him; second, repayment of his other liabilities up to $14.25 million (including the Republic loan); next, $4.7 million of repayment to Sirazi; then repayment of other liabilities, up to $10.5 million; and finally "twenty five percent (25%) of … such Distributions to Sirazi." According to GMH, the previously listed obligations of Rezko would leave very little for Sirazi's 25 percent share of distributions received by Rezko from the sale of his stock in Heritage.

GMH valued Rezko's holdings in Heritage at $31.8 million, far more than the $12.9 million that Rezko owed Sirazi (not including interest). But there was a hitch: as we said, Rezko hadn't received anywhere near $31.8 million in cash for giving up his Heritage holdings to GMH. Owing GMH as he did more than $26 million, he received only about $5 million, most of which went to pay for the defense of the criminal case against him. The balance of the $31.8 million thus consisted of forgiveness of Rezko's debt to GMH.

GMH argues that only money actually received by Rezko can be deemed "proceeds" owed Sirazi under the settlement agreement, and therefore that Rezko could not pay Sirazi from his deal with GMH because the deal had yielded Rezko only $5 million in actual money. One might think that if Rezko's holdings in Heritage were indeed worth $31.8 million (which the jury was entitled to believe on the basis of GMH's book valuation and the opinion of Sirazi's expert, discussed below), he should have been able to repay Sirazi $12.9 million. The reason he couldn't is that he'd lost control of the $31.8 million, first because of his large debts to GMH and second because of the desperation that enveloped him when he was prosecuted, inducing him to give up his property in exchange for the relatively modest amount of cash that he needed in order to pay his lawyers. It probably was a matter of indifference to him whether he conferred the value obtained from his investment in Heritage on GMH or on Sirazi; but in fact he owed a significant part of it to the latter rather than all of it to the former.

Rezko's investment in Heritage might have been worth $31.8 million to him had he found a cash buyer, and in that event he could have repaid Sirazi. But because he either couldn't find such a buyer or didn't look for one, he was able to obtain only the $5 million in cash from GMH. The remaining $26 million may seem to have been an entirely phantom number: forgiveness for debts he couldn't pay. It would not belong in "proceeds" of his deal with GMH unless forgiveness conferred *some* benefit on Rezko. Debt is a cost, cancellation of a debt therefore a benefit, but how great a one in this case is unknown. But because Sirazi's expert witness testified that the entire $31.8 million should be treated as proceeds, to conform to general accounting principles, and

because GMH provided no alternative expert estimate of the value of the debt forgiveness to Rezko, the jury was entitled to treat the entire $31.8 million as proceeds.

Rezko breached the settlement agreement by failing to pay Sirazi anything, and the jury could as it did find GMH liable for tortious interference with contract because it induced Rezko to flout his agreement to repay Sirazi. But Sirazi's suit also charges GMH with unjust enrichment and conspiracy, and this may seem piling on unjustly. But it isn't. A person or firm can tortiously interfere with a contract without obtaining any money from his tort. But GMH did obtain money from defrauding Sirazi, by deflecting to itself money owed Sirazi. It was thus enriched unjustly. Likewise it conspired with Rezko to transfer his property to it without paying anything to Sirazi, thus further deflecting to GMH money owed Sirazi. As there was no possible excuse for the deliberate misconduct, amounting to theft, in which GMH engaged, there is no basis for overruling the jury's award of $5 million in punitive damages against GMH.

GMH challenges the amount of compensatory damages that the jury awarded Sirazi. It argues that the settlement agreement did not require Rezko to repay Sirazi, out of the proceeds of Rezko's sale of his interest in Heritage, for Sirazi's having repaid Mutual Bank after Rezko defaulted on his $5 million bank loan. The settlement agreement had Rezko assigning the Republic Bank loan to Mutual Bank in order to extend the deadline for repayment, yet instead Rezko had repaid the Republic Bank loan out of a new loan he obtained from Mutual Bank, also with Sirazi's guaranty. But to allow Rezko to avoid his obligation to Sirazi (to the benefit of GMH) because he refinanced the loan rather than having it

assigned would be to embrace a distinction without a differ-
ence, contrary to Illinois contract law. See *Gallagher v. Lenart*,
874 N.E.2d 43, 58 (Ill. 2007); *Medcom Holding Co. v. Baxter
Travenol Laboratories, Inc.*, 984 F.2d 223, 226 (7th Cir. 1993)
(Illinois law). "[A] contract will not be interpreted literally if
doing so would produce absurd results, in the sense of re-
sults that the parties, presumed to be rational persons pursu-
ing rational ends, are very unlikely to have agreed to seek."
*Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 859–
60 (7th Cir. 2002) (Indiana law).

GMH's last argument is that the $12.9 million award of
compensatory damages should have been offset by the
$524,000 that Sirazi has already recovered from Rezko's
bankruptcy. Sirazi points out that the jury knew about the
bankruptcy recovery. But the jury would not have awarded
Sirazi $12.9 million in damages had it subtracted the bank-
ruptcy recovery. And Sirazi had stipulated to such an offset.
GMH is entitled to it therefore, and so the jury's award must
be reduced by $524,000.

It remains only to consider Sirazi's cross-appeal against
Auchi, whom the jury found liable to Sirazi for unjust en-
richment, making him jointly liable with GMH for the com-
pensatory damages awarded by the jury. The jury also
awarded $5 million in punitive damages against him. The
district judge vacated the verdict against Auchi on the
ground that he hadn't personally received any profits from
GMH's transaction with Rezko. That was incorrect. Auchi is
not only the chairman of GMH but also the company's 100
percent owner. He had been kept fully informed of, encour-
aged, and been centrally involved in approving the fraud
against Sirazi, and as the owner of GMH he was enriched by

his conduct—unjustly. The jury's finding him liable for unjust enrichment must therefore be reinstated, making him jointly liable with GMH for the compensatory damages to which Sirazi is entitled.

As for the award of punitive damages against Auchi, however, that would be proper only if he'd been guilty of tortious interference with Sirazi's contract with Rezko. *Giles v. General Motors Corp.*, 802 N.E.2d 858, 865–66 (Ill. App. 2003). But the jury exonerated him of tortious interference (also of civil conspiracy), and therefore Sirazi was not entitled to punitive damages from him.

In summary, the damages award against GMH is affirmed minus the $524,000 that Sirazi had received previously; the damages award against Auchi is reinstated minus punitive damages; and so the judgment of the district court is

AFFIRMED IN PART AND REVERSED IN PART.